**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

_____
CRMC BETHLEHEM, LLC                          )
                                             )
   AND                       )
                                             )
COMMONWEALTH BETHLEHEM                        )
  ENERGY, LLC                     )
                                             )
     Plaintiffs,  )
                                             )
      v.   )
                                             )
NORTH COUNTRY ENVIRONMENTAL                   )
  SERVICES, INC.                  )
                                             )
    Defendant.        )
_____ )

**COMPLAINT FOR DECLARATORY AND**
**INJUNCTIVE RELIEF AND DAMAGES**

Plaintiffs, CRMC Bethlehem, LLC and CommonWealth Bethlehem Energy, LLC,

through their attorneys Rath, Young and Pignatelli, P.C., bring this Complaint for breach of

contract as well as for declaratory and injunctive relief against Defendant North Country

Environmental Services, Inc. and allege as follows:

**NATURE OF ACTION**

1.      This is an action for breach of contract, as well as for declaratory and injunctive

relief, related to a Gas Lease and Easement Agreement which grants Plaintiff CRMC Bethlehem

LLC an exclusive right to extract and utilize landfill gas generated at a landfill owned by the

Defendant North Country Environmental Services, Inc. in Bethlehem, New Hampshire.

2.      This Complaint seeks damages related to NCES's wrongful interference with the

Plaintiffs' efforts to develop an energy recovery facility on the landfill property, and declaratory

and injunctive relief regarding the Plaintiffs' right to develop an energy recovery facility either on the landfill property or on adjacent property.

## PARTIES

3.      Plaintiff CRMC Bethlehem LLC ("CRMCB") is a Delaware limited liability company and is a wholly-owned subsidiary of CommonWealth Resource Management Corporation ("CRMC"), a Massachusetts corporation with its principal place of business in Massachusetts.

4.      Plaintiff CommonWealth Bethlehem Energy, LLC ("CBE") is a Delaware limited liability company, and is also a wholly-owned subsidiary of CRMC.

5.      Defendant North Country Environmental Services, Inc. ("NCES") is a Virginia corporation, which owns and operates a landfill in Bethlehem, New Hampshire.  Upon information and belief, NCES wholly owned by Casella Waste Systems, Inc. ("Casella").

## JURISDICTION

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because the Defendant corporation has its principal place of business in New Hampshire and because a substantial part of the events and omissions giving rise to the claim took place in New Hampshire.

## FACTS

### Background

6.      NCES owns and operates the NCES Landfill (the "Landfill") located at 581 Trudeau Road, Bethlehem, New Hampshire.

2

7.      NCES and CRMCB are parties to a Gas Lease and Easement Agreement dated September 10, 1998 (the "Original Gas Lease"), as amended by Amendment No. 1 to Landfill Gas Lease and Easement Agreement dated March 1, 2000 ("Amendment No. 1").  The Original Gas Lease as amended by Amendment No. 1 is referred to herein as the "Gas Lease".

8.      The Gas Lease gives CRMCB exclusive ownership of and control over landfill gas rights at the Landfill and the exclusive right to develop a project to recover energy from the landfill gas.  Specifically, the Gas Lease provided that CRMCB would (1) acquire a landfill gas management system ("LFGMS") previously installed by NCES, (2) develop at its own cost an Energy Recovery Facility ("ERF") to beneficially use the landfill gas it collected (including potentially an electric generation facility), and (3) be allowed to sublease some of its rights or obligations to an affiliated company in connection with a project.

9.      After entering into the Original Gas Lease, CRMCB investigated developing an electric generation project at the Landfill.  On September 21, 1999, NCES sent CRMCB a drawing showing NCES's preferred location for an electric generation project and asking CRMCB to show how the electric generation facility would be laid out at that location.  On November 23, 1999, CRMCB responded to NCES's request by sending a letter to NCES with a drawing showing the layout of the electric generation facility at that location.  CRMCB subsequently determined that an electric generation project at the Landfill was not feasible at that time, and decided to pursue a leachate evaporation project through an affiliate, Plaintiff CBE. CRMCB and NCES entered into Amendment No. 1 to accommodate the development of a leachate evaporation project.  Among other things, Amendment No. 1 identified a "Landfill Gas Utilization Area", depicted in Attachment A to Amendment No. 1, in which CRMCB or a

Sublessee could develop an ERF. The "Landfill Gas Utilization Area" depicted in Amendment No. 1 is substantially the same area proposed by NCES itself, in its e-mail sent on September 21, 1999, as the preferred location for an electric generation facility.

10.     CRMCB entered a landfill gas sales agreement with CBE and subleased certain land rights granted under the Gas Lease, as specifically contemplated in the Gas Lease, to CBE. CRMCB purchased the LFGMS from NCES for a price of $230,000, as contemplated in the Gas Lease.

11.     CBE developed its leachate evaporation project in 2000 and operated that project until April 5, 2007, when NCES elected to terminate an agreement under which NCES delivered leachate to CBE for evaporation.

**<u>Gas Lease</u>**

12.     Pursuant to Section 2.1 of the Gas Lease, CRMCB has "the exclusive right to explore for, extract, gather, process, measure, filter, produce, take, and use or sell, LFG from the Landfill".

13.     Pursuant to Section 2.2 of the Gas Lease, CRMCB has "a non-exclusive easement within and upon the Landfill to: (i) access and enter upon the Landfill; (ii) permit, design, construct, operate and maintain the Project, inclusive of the LFGMS … and to take actions required under this Agreement or any permit or governmental authorization issued with respect to the Project…." The easements granted under Section 2.2 apply to the property described in <u>Appendix A</u> of the Gas Lease (the "<u>Landfill Property</u>").

14.     Pursuant to Section 2.3 of the Gas Lease, NCES "agrees that [CRMCB] and its designated agents and contractors shall and may peacefully enjoy the Gas Lease and Easements

for the duration of the Term against all persons claiming by, through, or under [NCES], provided that [CRMCB] pays the sums herein recited to be paid by [CRMCB] and performs, or causes to be performed, all of [CRMCB]'s covenants and obligations under this Agreement.  The Gas Lease and Easements shall run with, and be appurtenant to, the land, and shall be binding on any successors of [NCES]."

15.     In Section I.O of the Gas Lease, the term "Project" is defined as "the LFGMS, Flare, ERF, together with all related equipment and facilities and interconnections to water, sewer, and utilities and to any other purchaser of energy."

16.     In Sections I.A, I.N and I.O of the Gas Lease, the term "LFGMS" is defined as the "Collection System" ("the LFG collection system, inclusive of all wells, piping, and point flares, existing upon the Landfill as of the date hereof, together with … any wells (vertical and horizontal), pipes, headers, pumps, interconnections to the Production Equipment, and any other materials and equipment installed at the Landfill subsequent to the date hereof to extract and collect Landfill Gas, as it may be modified or repaired from time to time pursuant to the terms of this Agreement") and the "Production Equipment" ("those components constituting facilities downstream from the Collection System, and including the main header pipe through which a blower creates suction to draw LFG from the Collection System, then the field blower/compressor,  initial meter(s), and interconnections to (but not including) the Flare or the fuel preparation components of the ERF.  The Production Equipment does not include any second stage fuel compressors, filters, meters, or other preparation equipment associated with the ERF").

17.     In Section I.E of the Gas Lease, the term "ERF" is defined to mean "one or more electrical and/or thermal energy generating units to be designed and installed by Lessee or any Sublessee pursuant to the terms hereof, and that will be primarily fueled by LFG from the Landfill, together with any second stage fuel compressors, filters, meters, and electrical transformers, switch gear, distribution lines, meters and related equipment necessary for the generation and delivery of energy to customers.  The ERF will use any supplementary fuels in a manner consistent with criteria applicable to 'qualifying small power production facilities' as such term is defined in federal regulations implementing the Public Utility Regulatory Policies Act of 1978 …".

18.     Amendment No. 1 designated a "Landfill Gas Utilization Area" on the Landfill Property, depicted in Attachment A to Amendment No. 1.

19.     Section 3.1(b) of the Gas Lease provides as follows: "[t]he ERF's design and plan of incorporation into the Landfill, any additional LFGMS permit applications and any material supplements or amendments to such plans, procedures, applications, authorizations, or agreements, shall be subject to prior review and written approval of Lessor for the specific purpose of ensuring consistency with any agreements, authorizations, or plans entered into, or required of, Lessor, including this Agreement and Lessor's Landfill operations and governmental authorizations."

20.     Section 3.1(b) of the Gas Lease further provides that "[a]ny such review shall be conducted promptly, and in no event shall such review exceed ten (10) business days from the date of Lessor's receipt of the written submission by Lessee, after which Lessor shall be deemed to have approved the measure in question."

6

21.     Section 3.2(f) of the Gas Lease provides as follows:  "[e]ach party shall promptly furnish the other with any document, record, plan, or data (including correspondence with, or notices from, any governmental agency) made, developed, or received with respect to, or in any way relevant to, the Project."

22.     Section 3.3 of the Gas Lease provides as follows:  "[t]he parties understand and agree that each party shall provide reasonable assistance and cooperation to the other as may be required in order to develop, construct, install, repair, maintain, and operate the Project and preserve all authorizations applicable to the Project and the Landfill in the most cost-effective manner and consistent with applicable law and Lessor's responsibilities in owning and operating the Landfill ….  Each party shall use good faith efforts to avoid interfering with the other party's operations and performance of its obligations at the Landfill, including the reasonable modification of operations or procedures to the extent practicable to avoid the imposition of an [sic] additional substantive costs on the other party in the performance of its obligations at the Landfill."

23.     Under Section IV of the Gas Lease, the term of the Gas Lease began on September 10, 1998 (the "Commencement Date") and ends on September 7, 2016 (sixteen years after the "Commercial Operation Date"), with CRMCB having the right to two five-year extensions.  NCES has confirmed in writing that the Commercial Operation Date occurred on September 7, 2000.

24.     Section 6.1 of the Gas Lease provides as follows:  "Beginning with the Quarterly Period during which the Commercial Operations Date occurs,  as a condition to the granting of any sublease to a Sublessee, Lessee shall require any Sublessee to pay to Lessor quarterly

7

payments equal to three percent (3%) of revenues actually received (such revenues received to exclude all transmission or wheeling costs) during such Quarterly Period from gross electricity sales from the ERF to any third parties other than Lessor (or its designees) ("Sublessee Payments"), regardless of when such sales occurred.  Such Sublessee Payments shall be pro rated with respect to any partial Quarterly Period occurring during the Term of this Agreement.  In the event that any Sublessee fails to make Sublessee Payments when due as set forth in this Agreement, Lessee shall be obligated to make such Sublessee Payments.  In the event that the Lessee is also the owner and operator of the ERF, Lessee shall pay all Sublessee Payments due to Lessor hereunder."

### CRMCB Requests NCES's Approval of Electric Generation Project Plans.

25.     In 2008, CRMCB and CBE determined that an electric generation project (the "Project") at the Landfill was economically feasible.  On September 24, 2008, CRMCB purchased a modular 1.4 MW electric generation facility (the "Generating Unit") located in Standard, Alberta, Canada, with the intention of moving it to the Landfill and installing it there.

26.     In September 2008, CRMCB developed a site plan for the Project that included siting some equipment in the "Landfill Gas Utilization Area" approved by NCES in 2000, and some equipment, including the Generating Unit, in an area adjacent thereto.  The Landfill Gas Utilization Area is located on the far northeastern corner of the Landfill Property, well outside of the landfill footprint.

27.     On September 29, CRMCB sent a letter to NCES notifying NCES of CRMCB's intention to develop the Project at the Landfill, enclosing copies of the site plan, and requesting NCES's review and approval of the plan pursuant to Section 3.1(b) of the Gas Lease.

28.     In a letter to CRMCB dated October 9, NCES requested additional information regarding CRMCB, and asserted that the 10-day review period under Section 3.1(b) would not begin until that additional information was received.

29.     On October 14, CRMCB sent a letter to NCES containing the additional information regarding the proposed Project that NCES had requested.

30.     On October 30, representatives of CRMCB met with representatives of NCES, including Mr. James Bohlig ("Bohlig"), an officer of Casella, to further discuss CRMCB's plans. At that meeting, Bohlig stated that NCES intended to approve CRMCB's Project plan and wanted to explore an agreement with CRMCB on how NCES might be able to use excess LFG not needed for the Project ("Excess LFG").  Bohlig discussed his desire to use Excess LFG to develop a NCES-owned electric generating project but did not propose any specifics.  CRMCB said that it would consider in good faith any proposal regarding Excess LFG that NCES might make.  Bohlig proposed that NCES's attorney draft a document approving CRMCB's proposed Project and plan under Section 3.1(b) and terms regarding potential use of Excess LFG. CRMCB also accommodated a request made by NCES during the meeting to suspend the 10-day review period until further notice in order to accommodate NCES's desire for more time to review CRMCB's plans.

31.     At the same meeting, Bohlig discussed NCES' pending application with the New Hampshire Department of Environmental Services ("NHDES") for approval of an expansion of the landfill (the "First Landfill Expansion Application") and proposed that CRMCB meet with NCES's technical team to determine a mutually agreeable site for the Project, and that NCES and CRMCB then jointly meet with NHDES to present such Project.

9

32.    On October 31 and November 5, CRMCB discussed its proposed Project plan with NCES's technical team.  The NCES technical team identified a new area for the Project close to the area proposed by CRMCB on September 29, stated that moving the Project to the new area addressed any concerns that NCES had about the location of the Project, and requested that CRMCB modify its September 29 site plan to reflect the new area identified by NCES.  In fact, both the area proposed by CRMCB for its Project on September 29 and the new area identified by the NCES technical team were well outside the landfill footprint proposed by NCES in the First Landfill Expansion Application.

33.    On November 5, CRMCB participated, along with NCES, in a joint meeting with NHDES to discuss the Project in light of NCES's landfill expansion plan.  CRMCB presented the Project and development approach to NHDES, and NCES shared the modified site plan for the Project with NHDES.

34.    On November 12, NCES' attorney delivered a draft agreement between NCES and CRMCB to CRMCB's attorney.  This draft agreement did not offer final approval by NCES of CRMCB's plan and committed Excess LFG to NCES without containing any specific proposal for its use or compensation to CRMCB.

35.    On November 17, counsel for CRMCB advised counsel for NCES that the November 12 draft agreement was inconsistent with the discussions at the October 30 meeting and sent a revised draft agreement under which NCES would approve CRMCB's plan and NCES would have an exclusive period to develop a proposal for the use of Excess LFG for CRMCB's consideration.

36.     NCES subsequently advised CRMCB that its November 17 draft agreement was not acceptable.

37.     On December 5, CRMCB sent a letter to NCES formally proposing the modified site plan discussed with NCES's technical team in November, and shown to NHDES in NCES's presence and with NCES's concurrence, requesting NCES's review and approval of the plan under Section 3.1(b) of the Gas Lease.

38.     Also on December 5, CRMCB sent a separate letter solely to Mr. Bohlig asserting CRMCB's right to all landfill gas collected at the Landfill (including Excess LFG), and explaining that approval of CRMCB's plan under Section 3.1(b) and discussions about the potential use of Excess LFG were separate issues.

39.     On December 17, NCES sent a letter to CRMCB stating that NCES was unable to approve the proposed site location for the Project.  It cited the fact that NHDES had denied NCES's landfill expansion request on December 12 and stated that NCES was in the process of developing new plans for expansion of the Landfill, which plans could affect the land available for the Project.  The letter advised that the revised landfill expansion plans would be available in two or three weeks.

40.     On December 24, CRMCB responded in a spirit of cooperation acknowledging the December 17 letter and confirming its interest in receiving a copy of NCES's revised landfill expansion request.

41.     In January 2009, NCES submitted a revised application for approval of a landfill expansion plan (the "Second Landfill Expansion Application") to NHDES.  In January and February, CRMCB made several requests, orally and in writing, for a copy of the Second

Landfill Expansion Application.  On February 12, NCES sent a letter to CRMCB stating that it would send CRMCB a copy of the Second Landfill Expansion Application under separate cover and that NCES remained interested in the Project.  However, NCES never sent CRMCB a copy of the Second Landfill Expansion Application.  On March 25, NHDES sent NCES a denial of the Second Landfill Expansion Application.

42.     CRMCB later obtained a copy of the Second Landfill Expansion Application directly from NHDES.  The Second Landfill Expansion Application did not propose that NCES would make any use of the areas that were proposed by CRMCB for its Project in either its September 29 letter or its December 5 letter.

43.     On May 8, 2009, CRMCB sent a letter to NCES stating that NCES was in breach of the Gas Lease.  The letter also proposed and requested approval of a new site plan for the Project (the "Landfill Project Development Plan"), with the ERF to be located entirely within the "Landfill Gas Utilization Area" approved by NCES in 2000 in Amendment No. 1, while reserving the right to claim that such approval was not required.

44.     On May 21, NCES sent a letter to CRMCB stating that NCES was not in breach of the Gas Lease, NCES had the right to withhold approval of CRMCB's earlier plans and NCES would not approve the Landfill Project Development Plan contained in CRMCB's letter dated May 8, 2009.

**Planned Development of an Electric Generation Project on the Tucker Property.**

45.     After receiving NCES' May 21 letter, CRMCB decided that NCES had no intention of approving any proposal by CRMCB for the Project on the Landfill Property, notwithstanding NCES's obligations under Section 3.1(b) of the Gas Lease.  CRMC entered an

agreement with Daniel Tucker and Anna Tucker Miner (collectively, the "<u>Tuckers</u>") obtaining the right to develop the Project on property adjacent to the Landfill Property and owned by the Tuckers (the "<u>Tucker Property</u>").

46.     In order to develop a Project on the Tucker Property, CRMCB would extend a pipe underground from the Landfill Gas Utilization Area across about 125 feet of the Landfill Property and into the Tucker Property, where CRMCB would deliver and sell landfill gas to an affiliate, Muchmore Energy LLC ("<u>Muchmore</u>"), also a wholly-owned subsidiary of CRMC. Muchmore would develop the Project and sell electricity to one or more electricity buyers. The power would be delivered to the electric grid using transmission lines along Muchmore Road, adjacent to the Landfill Property and the Tucker Property.

47.     On August 14, CRMCB sent a letter to NCES stating that (a) NCES's failure to approve any of CRMCB's earlier proposed plans constituted a breach of the Gas Lease; (b) to mitigate the damages caused by NCES's breaches, CRMCB planned to build an electric generation facility on the Tucker Property (the "<u>Tucker Project Development Plan</u>"); (c) the Tucker Project Development Plan did not require NCES's approval under the Gas Lease; and (d) neither CRMCB nor any affiliate owning the Project would owe any Sublessee Payments to NCES under the Tucker Project Development Plan because neither CRMCB nor any affiliate would be a Sublessee.

48.     To date, NCES has neither: (1) approved CRMCB's development of an ERF on the Landfill Property; (2) approved CRMCB's development of an ERF on the adjacent Tucker Property; nor (3) acknowledged that its approval of the ERF and the remaining components of the Project is not required for either location.

13

**Damages**

49.      Landfill gas is a finite resource.  Landfills produce landfill gas as bacteria consume biodegradable waste in the landfill.  The landfill gas must be consumed as it is generated.  Currently, all landfill gas collected at the Landfill is being flared.  Over time, the landfill gas produced by the Landfill will diminish to the point that not enough landfill gas will be available to support the Project.

50.      Had NCES approved CRMCB's plan proposed on September 29, 2008, CRMCB would have been able to immediately begin construction of its Project.  CRMCB has lost and can never recover the potential revenues from electric generation since the landfill gas is destroyed in a flare as it is collected.  Each day that NCES's approval is delayed results in further lost revenues.

51.      CRMCB will incur additional moving costs and storage costs for the Generating Unit because CRMCB will be required to move the Generating Unit into interim storage at an off-site location, and subsequently, to move it again to its final site location.

52.      Because NCES refused to approve any plan to develop the Project on its Landfill Property, CRMCB was forced to pursue development of the Project on the Tucker Property in order to mitigate its damages.  Under its agreement with the Tuckers, CRMCB is obligated to make certain payments to the Tuckers.  CRMCB would not have incurred that obligation but for NCES's unreasonable refusal to approve a project on the Landfill Property.

53.      Development of the Project on the Tucker Property might involve permitting requirements that would not be applicable to the Project on the Landfill Property, with related

additional costs.   Furthermore, there is no assurance that CRMCB will be successful at obtaining

any required local permitting to develop the Project on the Tucker Property.

## COUNTS

### COUNT I  (DECLARATORY JUDGMENT AS TO DEVELOPMENT OF PROJECT ON LANDFILL PROPERTY)

54.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 53 set forth

above.

55.     Pursuant to 28 U.S.C. § 2201, this Court is authorized to "declare the rights and

other legal relations of any interested party seeking such declaration, whether or not other relief

is or could be sought."

56.     CRMCB and CBE are entitled to declaratory relief in that they claim a contractual

right to develop an ERF within the Landfill Gas Utilization Area and the remainder of their

Project within the Landfill Property and Defendant NCES has failed and refused to acknowledge

their right to do so.

57.     Under Section 3.1(b) of the Gas Lease, NCES is authorized to review the ERF

plans "for the <u>specific</u> purpose of ensuring consistency with any agreements, authorizations, or

plans entered into, or required of [NCES] including this agreement and [NCES'] landfill

operations and governmental authorizations (emphasis added)."  NCES has no right under the

Gas Lease to review or approve plans for the remaining components of the Project that are not

part of the ERF.

58.     Amendment No. 1 had already identified a "Landfill Gas Utilization Area" in

which NCES had agreed that CRMCB or any Sublessee may develop an ERF.

15

59.     Because the Landfill Project Development Plan called for the ERF to be located within this "Landfill Gas Utilization Area" approved by NCES in 2000, no additional approval by NCES is required in order for CRMCB to proceed forward with development of the Landfill Project Development Plan.

60.     Assuming arguendo that any further authorization or approval by NCES is required, NCES may not lawfully withhold approval for development of an ERF within the Landfill Gas Utilization Area because locating the ERF in that area is not inconsistent with "any agreements, authorizations or plans entered into or required of [NCES]."  Specifically, the Landfill Gas Utilization Area is located well outside both (1) the current landfill footprint, and (2) any landfill expansion area described in plans that have proposed by NCES.

61.     NCES may not lawfully withhold approval of the location of an ERF within Landfill Gas Utilization Area on the grounds that it may hypothetically develop landfill expansion plans in the future which might require use of such area, as such a position (1) is inconsistent with the language of Section 3.1(b) of the Gas Lease, which only allows review for consistency with "agreements, authorizations or plans entered into, or required of [NCES]" (emphasis added); and (2) would render completely useless the landfill gas rights which CRMCB bargained for and paid for since NCES could always take the position that any proposed project might interfere with hypothetical future plans.

62.     For the reasons set forth above, Plaintiffs are entitled to a declaratory judgment that (1) no further approvals from NCES are required in order for Plaintiffs to develop their Project in accordance with the Landfill Project Development Plan, and (2) if Plaintiffs are required to obtain further approval from NCES before developing their Project on the Landfill

Property as described in the Landfill Project Development Plan, NCES may not lawfully

withhold such approval since the proposed Project does not violate "any agreements,

authorizations or plans entered into or required of [NCES]."

**COUNT II (DECLARATORY JUDGMENT AS TO
DEVELOPMENT OF PROJECT ON TUCKER PROPERTY)**

63.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 62 set forth

above.

64.     Under Section 3.1(b) of the Gas Lease, NCES is only authorized to review a plan

for location of an ERF (not the remainder of a Project), only for consistency with existing

landfill authorizations or agreements, and only if the ERF is to be located within the Landfill

Property.

65.     Because the Tucker Project Development Plan does not contemplate development

of an ERF on the Landfill Property, but rather on the adjacent Tucker Property, the Tucker

Project Development Plan does not require the approval of NCES.

66.     Assuming arguendo that any approval by NCES is necessary in order to proceed

with the Tucker Project Development Plan, NCES may not lawfully withhold such approval

because development of an ERF on the Tucker Property is not inconsistent with "any

agreements, authorizations or plans entered into, or required of [NCES]".

67.     For the reasons set forth above, Plaintiffs are entitled to a declaratory judgment

that (1) no further approvals from NCES are required in order for Plaintiffs to develop their

Project in accordance with the Tucker Project Development Plan, and (2) if Plaintiffs are

required to obtain further approval from NCES before developing their Project on the Tucker

17

Property as described in the Tucker Project Development Plan, NCES may not lawfully withhold

such approval since the proposed Project does not violate "any agreements, authorizations or

plans entered into or required of [NCES]."

<u>**COUNT III (DECLARATORY JUDGMENT: SUBLESSEE PAYMENTS)**</u>

68.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 67 set forth

above.

69.     Section 6.1 of the Gas Lease provides that, as a condition to the granting of any

sublease to a Sublessee of CRMCB, CRMCB must require the Sublessee to make certain

quarterly payments to NCES.

70.     If CRMCB proceeds with the Tucker Project Development Plan, then neither

CRMCB nor any affiliate owning the Project would be a "Sublessee" with respect to the Landfill

Property.  If neither CRMCB nor any affiliate owning the Project is a "Sublessee," then neither

CRMCB nor any such affiliate would owe "Sublessee Payments" under Section 6.1 of the Gas

Lease.

71.     For the reasons set forth above, Plaintiffs are entitled to a declaratory judgment

that if CRMCB proceeds with the Tucker Project Development Plan, then neither CRMCB nor

any affiliate owning the Project would owe any Sublessee Payments to NCES.

<u>**COUNT IV (INJUNCTIVE RELIEF)**</u>

72.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 71 set forth

above.

73.     For the reasons set forth above, Plaintiffs are entitled to an injunction prohibiting

NCES from (1) taking any action which would interfere with the development of the ERF within

18

the Landfill Gas Utilization Area and the remainder of the Project on the Landfill Property

consistent with the Landfill Project Development Plan; (2) taking any action which would

interfere with development of the Project on the Tucker Property; and (3) attempting to collect

"Sublessee Payments" pursuant to Section 6.1 of Gas Lease if the Project is developed on the

Tucker Property.

<u>**COUNT V (BREACH OF CONTRACT AS TO CRMCB)**</u>

74.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 73 set forth

above.

75.     The Gas Lease constitutes a binding contract between Plaintiff CRMCB and

Defendant NCES.

76.     NCES has breached said contract by (1) failing to approve CRMCB's plans

pursuant to Section 3.1(b) of the Gas Lease where CRMCB's plans were not in any way

inconsistent with "any agreements, authorizations or plans entered into, or required of [NCES]";

and (2) taking the position that it may refuse to approve any plans for an ERF facility on the

Landfill Property because any such plans "might" interfere with hypothetical future landfill

expansion plans.

77.     As a result of NCES's breach of its contractual commitments, CRMCB has

suffered damages in lost revenues, additional moving costs, rental costs, and additional costs

associated with the development of the Project on the adjacent Tucker Property.

19

## COUNT VI (BREACH OF  IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING)

78.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 77 set forth

above.

79.     In every contract entered into in this State, there exists an implied covenant of

good faith and fair dealing.

80.     By its conduct above, NCES has breached the implied covenant of good faith and

fair dealing inherent in its Gas Lease with Plaintiff CRMCB.

81.     As a result of NCES' breach of its covenant of good faith and fair dealing,

CRMCB has been damaged as set forth above.

## COUNT VII (THIRD PARTY BENEFICIARY CLAIM BY CBE)

82.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 81 set forth

above.

83.     The Gas Lease specifically contemplated that CRMCB would be allowed to

sublease certain of its rights and obligations under the Gas Lease to an affiliated company in

connection with the development of a Project.

84.     Pursuant to said provision, CRMCB entered into a Landfill Gas Sales Agreement

with CBE and subleased certain land rights granted under the Gas Lease.

85.     CBE is a third party beneficiary of the Gas Lease entered into between NCES and

CRMCB in that the Gas Lease was so expressed to give NCES reason to know that a benefit to

an affiliated Sublessee was contemplated by CRMCB as one of the motivating causes for

CRMCB entering into the contract.

20

86.     As a result of NCES' breach of its contractual obligations, CBE has been damaged in that it has lost revenues that would have been generated if NCES had timely approved the plans submitted by CRMCB for development of an ERF on the Landfill Property.

## COUNT VIII (CONSUMER PROTECTION ACT, RSA 358-A)

87.     Plaintiffs adopt and incorporate by reference paragraphs 1 through 86 set forth above.

88.     Defendant is subject to the requirements of the New Hampshire Consumer Protection Act, RSA 358-A.

89.     Defendant is prohibited from using "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within the State." RSA 358-A:2.

90.     Defendant violated this provision by (1) misrepresenting its ability and willingness to allow CRMCB to develop an electric generating project on Defendant's Landfill Property; and (2) using the excuse that development of such a project might interfere with future hypothetical landfill development plans as a ruse to preclude CRMCB from making use of the landfill gas rights that it bargained and paid for.

91.     As a proximate result of Defendant's unfair and deceptive practices set forth above, the Plaintiffs have suffered and continue to suffer damages as set forth above.

92.     Plaintiffs seek treble damages and attorneys' fees as allowed by the Act.

WHEREFORE, Plaintiffs CRMCB and CBE respectfully request that this Honorable Court:

A.      Declare that approval of the Landfill Project Development Plan by Defendant NCES is not required under the Gas Lease, or if such approval is required, Defendant NCES may not lawfully withhold approval of the Landfill Project Development Plan, or take any steps to interfere with the development of a Project on the Landfill Property consistent with the Landfill Project Development Plan;

B.      Declare that approval of the Tucker Project Development Plan by Defendant NCES is not required under the Gas Lease, or if such approval is required, Defendant NCES may not lawfully withhold approval of the Tucker Project Development Plan or take any steps to interfere with Plaintiffs' or any affiliated company's development of a Project on the adjacent Tucker Property consistent with the Tucker Project Development Plan;

C.      Declare that if Plaintiffs or any affiliated company proceed with the development of the Project on the adjacent Tucker Property, neither Plaintiffs nor any affiliated entity will owe any "Sublessee Payments" to Defendant NCES pursuant to Section 6.1 of the Gas Lease;

D.      Enter an injunction restraining Defendant NCES from taking any steps to interfere with Plaintiffs' development of an ERF within the Landfill Gas Utilization Area or a Project on the Landfill Property, or on the adjacent Tucker Property;

E.      Award CRMCB and CBE their damages occasioned by Defendant NCES's breaches of its contractual obligations;

F.      Award CRMCB and CBE their reasonable attorneys' fees in bringing and prosecuting this action;

G.      Award CRMCB and CBE treble damages and reasonable attorneys' fees pursuant to the New Hampshire Consumer Protection Act, RSA 358-A; and,

H.     Grant such further relief as may be just and proper.


Respectfully submitted,

**CRMC BETHLEHEM, LLC**
   And
**COMMONWEALTH BETHLEHEM ENERGY, LLC**

By Their Attorneys,

**RATH, YOUNG AND PIGNATELLI, P.C.**

One Capital Plaza
Concord, NH 03302-1500
(603) 226-2600


October 14, 2009                    By: <u>/s/ Andrew W. Serell</u>
                                        Andrew W. Serell, Esquire
                                         (NH Bar No. 2298)